We'll hear argument next in No. 20-1306, Uniloc 2017 LLC v. Apple Inc. Again, Mr. Stephens. Thank you, Your Honor. Again, Jeffrey Stephens for Uniloc 2017 LLC. I will start by noting that the arguments that we have already addressed in the 20-1058 appeal as to cadence window apply also to claims in this case, specifically in the 424 IPR and in the 1028 IPR at issue here. I will, therefore, focus on the grounds that were based on Michnik for claims one through four and what the petitioners did here in their reply in response to arguments that were in their reply before the board, in response to arguments raised by the patent owner, they of the claims of the 902 patent. And as we lay out on our brief, Michnik is a vaginally implanted medical device and its purpose is sensing and recording data relevant to a clinical trial or study. And what we've laid out and as we did for the board is, you know, the reasons why one would not consider Michnik's device to be a mobile device as recited and described in the 902 patent. And specifically, the 902 patent states, and this is on Appendix 226, that electronic device 100 may be carried in a backpack, pocket, purse, hand, or elsewhere. And we note this is, I mean, this is a lay person or a person of order in the School of the Arts understanding of what would be a mobile device would be one that could be transferred and carried in such a manner. And, you know, Apple's contentions are essentially that, well, if, you know, if a person with a medical device, this is not a typical understanding of what would be a mobile device that could be transferred and carried in a backpack or pocket, purse, hand, et cetera. And this is important to the combination that the board adopted in relying on Michnik as the mobile device and is a clear error that the board made in adopting those arguments from petitioners. The other error that I'll focus on relating to Michnik is whether Michnik teaches the limitation requiring determining by the mobile device whether the motion has a motion signature indicative of a user activity that the mobile device is configured to monitor. And what we've argued here, Your Honors, is that Michnik is not focused on detecting and measuring sexual activity via accelerometers, but it gathers other data related to that. And so, in petitioner's mapping of this claim, they're essentially saying that, you know, the device will, let me, so as the claim recites, it's looking for a motion signature. And it's trying to determine whether that signature matches something that the device is configured to monitor. Well, and what petitioners have done in their mapping is to sort of disconnect that, you know, detecting the motion signature from the user activity that the device is configured to monitor. So, in Michnik, those are really two different things. The device might wake up based on a motion signature, but it's not looking for... You're saying that monitoring requires measurement? Yes. Well, it's also the signature that it's looking for has to be, you know, related to the activity the device is configured to monitor. So, yes, I mean, the same data that it's... It doesn't monitor movement, right? It detects it. It just doesn't measure it, in your view. I don't know if I'm understanding the, your Honor's question exactly. I'm... Never mind. Go ahead. Okay. Well, the... So, I mean, what we're arguing is that, you know, Michnik's purpose, what it's configured to monitor is to gather the data that is, you know, presented to its temperature sensors, pH sensors, heart rate sensor. These are the sensors that it, you know, uses to gather data and to monitor an activity. And what... And our contention is that for the device to be configured to monitor the activity, it's going to require more than determining whether a motion signature is indicative of the user activity. So, the monitoring is a step beyond sort of the initial motion signature that indicates user activity is occurring. So, these are disconnects in the mappings of Petitioner that the board essentially glosses over in its decision and does not fully address. And... I will note that, you know, that Petitioner did make one other argument to try to get around this problem in the mapping of the claims and noted that Michnik states that in other embodiments, the intervaginal unit may be entirely dispensed with and all data sent from an external unit on or near the participant. But again, there's a disconnect here where the petition does not tie this embodiment, you know, this other sort of cursory referenced embodiment to the detecting of sexual activity and that is what the petition maps to the determining step of Claim 1. So, it's really not, again, a disconnect where petitioners were essentially pointing to just various statements in the references without tying them together in a coherent way that would fit the mapping of Claim 1 as alleged to be unpatentable. Unless your honors have further questions, I will rest on the briefs with the other points raised there in terms of errors made by the board and urge the court to reverse the decisions of unpatentability. Okay. Thank you, Mr. Stevens. Ms. Moulton? Thank you, your honors. Good morning and may it please the court. I'll briefly address the mobile device question on Claims 1 through 4 and then I'll turn to the cross-appeal on Claim 9. And I'm happy to answer the court's questions on any of the other issues. I'm trying to focus on Michnik's internal embodiment and I just want to make one quick point on that, that Michnik's internal embodiment doesn't mean that it's permanently implantable like a pacemaker is, but Michnik teaches at paragraphs 92 and paragraph 14 that even the internal embodiment is designed to be easily inserted and removed by a user like a contraceptive ring. So it's mobile, as the board found, because it's small, battery-powered, easily transported and communicates wirelessly, but it also has this feature of being easily inserted and removed, unlike something permanently implanted. And then on counsel's point that Michnik's device both determines sexual activity and stores information about that from the acceleration monitors, Michnik teaches at paragraph 74 that it extracts and stores in memory acceleration measurements so that a researcher can later verify those acceleration measurements. And the board pointed this out in a few places in the final written decision at Appendix 18, 21, and 36, the board in all of those places recognized that Michnik does more than simply detect accelerometer data, it's also monitoring and recording data about that activity. So if there are any further questions on Michnik or Fabio, then I'll turn to Claim 9. On the cross-appeal on Claim 9, Unilock made no arguments to the board and now makes no arguments on the Marathon Appeal as to the patentability of Claim 9. Okay, so if I understand correctly, your argument here is that these limitations of Claim 9 are found in the Fabio prior art, I guess. But you're not arguing that they would have been obvious if they're not exactly found in the prior art, correct? That's right, Your Honor. Okay, that puts quite a burden on you to show that the board made an error in finding that these things aren't exactly present in the prior art. And you agree that each of these current acceleration measurements in the three steps has to be the same? Yes, the claim refers to using a current acceleration measurement and that's when you, in the red brief at page 78, we have the annotated figures. So the acceleration measurement is this acceleration measurement AZ that represents a step. So it's the waveform shown in Figure 5. So that is detected during the survey procedure in Figure 8. But I understand the board to have said, I guess it made two points. The first point is that the first step current acceleration measurement here in Fabio is an average. And that's why it's not the same as the second two steps. Do you understand it the same way that I do? Sort of. So in the first criterion in the survey mode, it's looking at this... If you could help me. I mean, tell me, did I correctly state what the board found? So my understanding, Your Honor, is that the average of the acceleration measurement is used to determine whether the first criterion is met. And then that same acceleration signal is used to determine whether the second and third criterion is met. So the first criterion... Are you saying then that the first measurement in Fabio is not an average? The first... So the measurement is always that acceleration waveform. And the first criterion is examining the average of that waveform. And then the second and third criterion are looking at the shape of that waveform. So you're saying that Claim 9 itself in the first step is looking to an average in the first measurement? Right. It says that the first criterion... Claim 9 says the first criterion is satisfied when a current acceleration measurement has a greater magnitude than a previous acceleration measurement. And the way that that's met in Fabio, which the board didn't dispute that Fabio teaches this, is by looking at the average of the current acceleration measurement and comparing that to the average of the previous acceleration measurement. Okay. But that's to be different from the second and third steps, right? The second and third steps are using that same acceleration measurement, the waveform shown in Figure 5. They're not using an average in the second and third steps? That's right. They're examining... They're looking at a different characteristic of the current acceleration measurement because they're looking at the threshold, the upper and lower threshold. But they're using the same set of data that was used in the first criterion. But they're not using the average as the current acceleration measurement, right? That's right. And what I'm saying is that the first criterion is to examine the average, and then the second and third criterion are to examine the measurement against these thresholds. So the criterion are different types of tests, but they're all using the same data to evaluate the criterion. Okay. Go ahead. Okay. So what the board misunderstood is that Fabio is actually using the same waveform or the three criteria. The board believes that Fabio measures a new waveform when it enters the first counting procedure, but that's not the case because Fabio is trying to count every step. So when it wakes up from the survey mode by detecting an acceleration measurement, it wants to use that same acceleration measurement and decide whether to count a step. So that same waveform is being set in the first counting procedure and then the step recognition test, which is shown in Figure 5. So the board misunderstood how that step recognition test in Figure 5 works when it found that threshold AZP...because threshold AZP is greater than threshold AZN, that AZN can't be the upper threshold. But Fabio at Column 4 explains that a step is recognized when the positive peak of acceleration signal AZ is greater than the threshold AZP, which is the floor, and has a negative peak less than threshold AZN, which is the ceiling. So that's exactly what Fabio is teaching, and it's consistent with how the board described Fabio in its institution decision and at the hearing. But when the board gave its final written decision at Appendix 57, it switched the two thresholds and found that AZN was not an upper threshold. The board's final misunderstanding on Claim 9 was that the absolute value of the amplitude of the current acceleration measurement has to be less than this upper threshold or ceiling AZN. But the broadest reasonable interpretation standard, which applies here, doesn't require that a magnitude is an absolute value. The 902 patent specification is careful to refer to an absolute value when it's required, like when it's discussing this lower threshold or floor that has to be surpassed, which is the threshold AZP. But this specification doesn't refer exclusively to absolute values when it's discussing the upper threshold AZN. The board gave no reason why a person of ordinary skill would impart an absolute value limitation onto Claim 9, particularly under the broadest reasonable interpretation standard. So properly understood, Fabio's threshold AZN is the upper threshold or ceiling that the acceleration signal can't hit, and its lower threshold is AZP that the acceleration signal has to exceed. And again, I'll just remind the court that UNILOC doesn't actually contest any of this on the merits. It just makes a waiver point, which we fully addressed in our reply brief on the cross appeal. Apple's petition at Appendix 300, its reply at Appendix 436, and then Dr. Paradiso's declaration at Appendix 964 all carefully spell out how Fabio's device transitions from the survey mode to the first counting procedure using that same underlying acceleration measurement. And then Fabio's upper and lower thresholds in Figure 5 map onto Claim 9's stepping criteria. If there are any further questions, I'm happy to answer them. Otherwise, we ask the court to reverse on Claim 9 and affirm on the remaining claims. Okay. Mr. Stephens? Thank you, Your Honor. I think I'd like to make a single brief point on the mobile device argument. And what I heard from counsel this morning was essentially an argument about the ease at which the device might be implantable. And reviewing the board's decision, there's really nothing that the board says that mobile device does not exclude implantable devices. And we think that it does for the reasons we laid out. And there's nothing in the board's decision talking about whether an implantable device is or is not easily implantable. What the board relies on, as counsel recognized, is that it's small, battery-powered, easily transported, which means that it moves with the patient and communicates wirelessly. And we submit that's not sufficient for a mobile device, as one ordinary skilled in the art would understand that term. For the cross-appeal, Your Honor, we'd like to, as we did in our briefs, rely on the reasoning of the board and let it stand there. Thank you. Okay. Ms. Moulton, you maybe have a minute. Sure. Thank you, Your Honor. Are there any questions on the cross-appeal? Then we ask the court to reverse on Claim 9 and affirm on the remaining claim. Thank you. Okay. Thank you, Mr. Stevens. Thank you, Ms. Moulton. The case is submitted. That concludes our session for this morning. The Honorable Court is adjourned until tomorrow morning at 10 a.m.